UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION,<br>550 17th Street, N.W.,<br>Washington, D.C. 20429,<br><br>   Plaintiff,<br><br>vs.<br><br>THE ADAM CORPORATION/GROUP,<br>1111 Briarcrest Drive, Suite 300,<br>Bryan, Texas 77802,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)  No. 1:07-cv-02163 RMU<br>)<br>)<br>)<br>)  FIRST AMENDED COMPLAINT<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiff Federal Deposit Insurance Corporation ("FDIC"), Manager of the FSLIC Resolution Fund, for its complaint ("Complaint") against The Adam Corporation/Group ("TAC"), alleges as follows:

Parties

1. The FDIC is a government corporation organized and existing under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.* Pursuant to 12 U.S.C. § 1819(b)(1), the FDIC is an agency of the United States for the purpose of bringing an action under 28 U.S.C. § 1345. Pursuant to 12 U.S.C. § 1821a(a)(1), the FDIC is the Manager of the FSLIC Resolution Fund, successor in interest to the Federal Savings and Loan Insurance Corporation ("FSLIC").

2. TAC is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Bryan, Texas.

Jurisdiction and Venue

3.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 because it is a civil action commenced by the FDIC, which, for the purpose of § 1345, is an agency of the United States; and pursuant to 28 U.S.C. § 1331 because all cases to which the FDIC is a party are deemed to arise under the laws of the United States, by virtue of 12 U.S.C. § 1819(b)(2)(A).

4.  Venue is proper in this forum pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to the claim occurred in this district. Venue is also proper in this forum pursuant to Section 13.4 of an agreement entitled "Termination Agreement," dated July 31, 1996, between the FDIC and TAC, and certain subsidiaries of TAC.

General Allegations

A.  Overview Of Action.

5.  On October 14, 1988, Defendant TAC entered into a transaction with FSLIC whereby TAC purchased the assets and assumed certain liabilities of eleven failed savings and loan associations in Texas ("Acquired Associations"). The assets from the Acquired Associations were consolidated into NuOlney Savings Association, Olney, Texas ("NuOlney"), which, upon consummation of the transaction, changed its name to Olney Savings and Loan Association ("Olney"). TAC owned all of the stock of Olney.

6.  The terms of the transaction between TAC and FSLIC were set forth in a contract called an "Assistance Agreement," dated October 14, 1988. In general, under the Assistance Agreement, FSLIC agreed to provide Olney with certain financial assistance to cover losses that might arise out of the assets and liabilities of the Acquired Associations. Further, Section 9 of the Assistance Agreement required TAC to share with FSLIC 60 percent of the federal and state tax savings that TAC and its subsidiaries realized as a result of certain types of tax deductions or

exclusions that generated tax benefits, described in Section 9(a) as "Tax Benefit Items." *See* Assistance Agreement § 9 at 47-62.

7. In 1989, Congress created the FSLIC Resolution Fund, which succeeded to FSLIC's rights under the Assistance Agreement, and designated the FDIC as "Manager" of the Fund. Hereinafter "FDIC" shall refer to the FDIC as Manager of the FSLIC Resolution Fund as well as its predecessor, FSLIC.

8. In December 1989, Olney changed its name to AmWest Savings Association ("AmWest"). In 1994, TAC transferred AmWest's stock to a newly-created, wholly-owned subsidiary named TAC Financial. Subsequently, AmWest changed its name to First American Bank Texas, and then changed its name again to First American Bank ("FAB"). For ease of reference, FAB shall refer to itself as well as to its predecessors, NuOlney, Olney, AmWest and First American Bank Texas; TAC shall refer to itself as well as to its subsidiary, TAC Financial; and, collectively, TAC, TAC Financial and FAB shall be referred to as the "Consolidated Group," because they filed consolidated tax returns.

9. On July 31, 1996, TAC and the FDIC terminated the Assistance Agreement by entering into the Termination Agreement. However, the Termination Agreement expressly provided that Section 9 of the Assistance Agreement, and certain other specified provisions, survived the termination and remained binding on the parties. *See* Termination Agreement §§ 2.2 at 2-3, 7.2(b) at 22-23. For purposes of this Complaint, the surviving Section 9, as modified by the Termination Agreement, shall be referred to as Section 9.

10. On March 31, 2005, pursuant to a contract dated August 23, 2004, TAC sold all of its shares in FAB to Citibank, Texas ("Citibank") for a purchase price of $972 million (the "Sale"). As part of the Sale, TAC retained the obligation to share with the FDIC 60 percent of

3

certain federal and state tax savings that the Consolidated Group realized as a result of any Tax Benefit Items under Section 9.

11. On its 2004 federal tax return covering the period from October 1, 2004, through September 30, 2005, the Consolidated Group reported a capital loss of approximately $314 million as a result of the Sale. The Consolidated Group generated this $314 million capital loss—instead of incurring a taxable gain—because TAC's basis in the stock of FAB was approximately $1 billion higher than it would have been without the special tax treatment afforded the Tax Benefit Items. As a direct result of the special tax treatment afforded the Tax Benefit Items, TAC saved $257.8 million in tax payments, which is the amount TAC would otherwise have had to pay as a result of the Sale. Under Section 9, TAC owes the FDIC $154.7 million due to the $257.8 million in tax savings. The amount due to the FDIC is calculated as follows: ($257.8 million in tax savings) x (60 percent share to the FDIC) = $154.7 million.

12. TAC has refused to pay the FDIC the $154.7 million it owes, as well as additional unpaid amounts discussed below. TAC's failure to pay the FDIC is a breach of Section 9, for which the FDIC seeks damages. The FDIC filed its original Complaint on November 30, 2007, seeking those damages.

13. On November 30, 2007, one hour after the FDIC filed its original Complaint, TAC filed its own complaint in the United States District Court for the Northern District of Texas ("Texas Action"). The FDIC now files this First Amended Complaint to address allegations made by TAC after the FDIC filed its original complaint. Further, the FDIC is moving the United States District Court for the Northern District of Texas to transfer the Texas Action to this Court pursuant to 28 U.S.C. § 1404(a).

14. TAC's claim in the Texas Action is based on a statute enacted by Congress in 1993 known as the "Guarini Amendment." TAC alleges in the Texas Action that the Guarini Amendment had the effect of prohibiting TAC from claiming, as a tax deduction, losses reimbursed with FSLIC-assistance payments. TAC has alleged that, as a result of the Guarini Amendment, TAC allegedly overpaid its tax benefit sharing obligations to the FDIC in the amount of approximately $41 million, and TAC requests that amount from the FDIC as damages ("Guarini Claim"). TAC has also requested in the Texas Action a declaratory judgment that the Guarini Claim must be arbitrated pursuant to a dispute resolution clause set forth in the Termination Agreement. At the same time TAC filed the Texas Action, TAC filed a demand for arbitration with the American Arbitration Association in Dallas, Texas, seeking arbitration of the Guarini Claim. TAC also filed a motion to compel arbitration in the Texas Action.

15. In this First Amended Complaint, the FDIC's realleges its claim against TAC for monetary damages based on TAC's failure to pay at least $157.3 million in tax benefit sharing payments. In addition, the FDIC also requests a declaratory judgment that the arbitration provision of the Termination Agreement does not provide for arbitration of disputes over TAC's continuing tax benefit sharing obligations, including TAC's Guarini Claim. The FDIC further requests a declaratory judgment that TAC is not entitled to any relief under its Guarini Claim. The purpose of these amendments is to consolidate the respective claims of the FDIC and TAC into a single proceeding in the District of Columbia.

B.  The Treatment Of Tax Benefits Under Section 9.

16. The assistance to be provided by FSLIC to FAB pursuant to the Assistance Agreement included the following: (i) payments for losses realized on the disposition or liquidation of certain assets ("Covered Asset Losses"), (ii) payments of amounts necessary to guarantee a specified yield on certain assets ("guaranteed yield payments"), and (iii) issuance by

FSLIC to FAB of an interest bearing note (the "FSLIC note") with a principal amount equal to the excess of the liabilities assumed over the assets acquired by FAB from the Acquired Associations.

17.  In addition to receiving financial assistance from FSLIC, the Consolidated Group received tax benefits through special provisions of the Internal Revenue Code ("I.R.C.") with respect to the Tax Benefit Items, including the following:

   a.  The I.R.C. stated that the basis in the covered assets of each Acquired Association carried over to FAB. As a result, FAB acquired the covered assets with pre-acquisition built-in losses. In turn, FAB received tax-free financial assistance in the amount of the Covered Asset Losses.

   b.  The I.R.C. did not require TAC or the Consolidated Group to include in taxable income the assistance payments that FAB received for its Covered Asset Losses, guaranteed yield payments and interest on the FSLIC note.

   c.  FAB inherited the net operating losses and other tax attributes of the Acquired Associations. The Consolidated Group subsequently used some of these tax attributes to offset its post-acquisition income.

18.  Section 9 requires TAC to share with the FDIC all tax savings (i) that arise out of the preferential tax treatment given to the financial assistance that the FDIC paid to FAB, and (ii) with respect to tax attributes related to the acquisition of the assets of the Acquired Associations. Section 9(a) describes types of tax deductions or exclusions ("Tax Benefit Items") that may generate tax benefits. Section 9(b) describes types of tax detriment items that may offset tax benefits.

19.  Section 9(d) sets forth the formula used to calculate the net tax benefit savings—defined as the "Federal Net Tax Benefits"—that TAC is required to share with the FDIC. Section 9(d) provides as follows:

6

    (d) <u>Federal Net Tax Benefits</u>. The Federal Net Tax Benefits for a taxable year shall be Sixty Percent (60%) multiplied by an amount equal to the excess, if any, of:

      (1) the Federal income tax liability for such taxable year . . . which would have been incurred by the ACQUIRING ASSOCIATION, or the Consolidated Group, (i) if the Tax Benefit Items described in § 9(a)(1), (3), (4) and (5) had not been deducted, credited or excluded in any taxable year, (ii) if the Tax Detriment Items described in §9(b)(1), (2), (3) and (5) had not been included in income in any taxable year; (iii) if income were reduced by an amount equal to the deductions disallowed under § 9(b)(4) . . . (vi) if any Credits . . . which were included in taxable income for such taxable year . . . were not so included, over

      (2) the Federal income tax liability for such taxable year . . . actually incurred by the ACQUIRING ASSOCIATION, or the Consolidated Group [TAC and its subsidiaries]. . .

Assistance Agreement, § 9(d) at 53-54. Section 9(e) provides a substantially similar formula for calculating the net state tax benefit savings ("State Net Tax Benefits") that must be shared with the FDIC.

  20. Thus, to determine the amount of Federal Net Tax Benefits, one calculates the difference between the Consolidated Group's actual tax liability (*i.e.*, the subpart (d)(2) calculation above), and the "hypothetical" tax liability that the Consolidated Group would have had if the Tax Benefit Items had not been afforded special tax treatment under the I.R.C. (*i.e.*, the subpart (d)(1) calculation above). The Section 9(d) calculation is referred to as the "with and without calculation," referring to the difference between TAC's actual tax liability taking into consideration the special tax treatment afforded to the Tax Benefit Items (*i.e.*, the "with" calculation), and Adam's Corp's hypothetical tax liability without taking into consideration the special tax treatment afforded to the Tax Benefit Items (*i.e.*, the "without" calculation). For ease of reference, the "without" calculation is also referred to as calculating the Consolidated Group's "Hypothetical Tax Liability."

C. <u>The Termination Agreement</u>.

21. On July 31, 1996, TAC and the FDIC terminated the Assistance Agreement by entering into the Termination Agreement. Under the Termination Agreement, the FDIC made a lump sum payment to TAC in the amount of $8 million and, in return, the FDIC's obligation to make any further assistance payments to TAC was extinguished. However, the Termination Agreement expressly provided that Section 9 of the Assistance Agreement, and certain other specified provisions, survived the termination and remained binding on the parties.

22. The Termination Agreement also set up a system for resolving any items of assistance that were outstanding at the time of the 1996 Termination Agreement or that arose shortly after the termination. In essence, the Termination Agreement established a "true-up" process to resolve these outstanding assistance payment issues. This true-up process, and any resulting arbitration, was designed to be concluded relatively quickly after the July 1996 closing of the Termination Agreement, by a defined "Arbitration Deadline Date," which occurred within a little more than one year following the closing.

23. Section 6.1 of the Termination Agreement permitted TAC and the FDIC to arbitrate disputes arising out of the true-up process under the Termination Agreement. The provision states that the right to submit those claims to arbitration is waived unless arbitration was initiated by the defined "Arbitration Deadline Date." *See* Termination Agreement § 6.1 at 19. The Arbitration Deadline Date occurred roughly one year and 120 days after the July 1996 Closing Date of the Termination Agreement, or roughly ten years ago. *See id.* § 5.1-5.3 at 16-18. Thus, any right under this provision expired roughly ten years ago.

24. In contrast, any disputes over tax benefit sharing under Section 9 are governed by Section 13.4 of the Termination Agreement, which provides as follows:

> This Agreement and the rights and obligations hereunder shall be governed by and construed in accordance with the Federal law of the United States

8

> of America and, in the absence of controlling Federal law, in accordance with the law of the State of Texas. Any legal action or proceedings with respect to this Agreement shall be brought in the Federal courts of the United States of America located in either the District of Columbia or the State of Texas and each party hereto submits to the jurisdiction of such courts and hereby waives any objections on the grounds of venue, forum non conveniens, or any similar grounds.

Thus, Section 13.4 contains a forum selection clause allowing claims to be brought in federal court in either the District of Columbia or Texas.

D.    <u>TAC's Sale Of Stock To Citibank</u>.

25.   Effective March 31, 2005, TAC sold its stock in FAB to Citibank for $972 million. On the Consolidated Group's tax return, TAC reported that its basis in the FAB stock at the time of the Sale was $1.28 billion. However, that stock basis was approximately $1 billion higher than it would have been but for the special tax treatment afforded to the Tax Benefit Items. The I.R.C. regulations required TAC to make certain adjustments to the stock basis. *See* 26 C.F.R. § 1.1502-32(b)(2). These adjustments were necessary to give effect to the purpose of the consolidated return regulations, which is to treat all the corporations in the Consolidated Group as if they were a single corporation for the purposes of computing the Consolidated Group's tax liability. *See* 26 C.F.R. § 1.1502-32(a)(1). These adjustments are made with respect to taxable income or loss, tax-exempt income, noncapital, nondeductible expenses, and distributions with respect to the stock. *See* 26 C.F.R. § 1502-32(b)(2).

26.   As required by the I.R.C., TAC calculated its taxable income or loss on the sale of stock to Citibank by subtracting its reported basis in the stock ($1.28 billion) and the selling costs ($6 million) from the purchase price ($972 million) it received from Citibank. Based on this calculation, TAC reported a loss of $314 million on the Sale. If the calculation had resulted in a positive number, TAC would have been taxed on the capital gain from the Sale. However,

because the result was negative, TAC was able to report a loss and did not pay any tax on the Sale.

27. Under a proper application of the "with and without calculation" under Section 9(d), TAC's Hypothetical Tax Liability from the Sale was $257.8 million. This Hypothetical Tax Liability is calculated by properly treating the Tax Benefit Items as if they had not been afforded special tax treatment. The difference between the tax that TAC reported on its tax return as a result of the Sale, which was $0, and the tax that it would have had to pay as calculated pursuant to Section 9(d), is $257.8 million. Section 9 requires TAC to pay the FDIC 60 percent of the $257.8 million, which is $154.7 million. TAC has refused to make that payment.

E.   Future Tax Benefits

28. TAC has retained approximately $275 million of the capital loss from the Sale and approximately $87 million of net operating losses for use in the future to offset income and thereby receive tax benefits. TAC's future realization of the tax benefits will result in tax benefit sharing obligations to the FDIC because the resulting tax savings would not have existed under the Hypothetical Tax Liability calculation required by Section 9(d).

29. TAC's full use in the future of the $275 million in capital losses and $87 million of net operating losses would result in, respectively, $58 million and $18 million in tax sharing payments due from TAC to the FDIC pursuant to Section 9.

30. TAC denies that it has any continuing obligation to share any future tax benefits with the FDIC from the use of the remaining capital losses and net operating losses that it has retained after the Sale to Citibank.

F.   Additional Unshared Tax Benefit Savings.

31.   I.R.C. § 381 carryovers can be Tax Benefit Items or Tax Detriment Items as defined in Sections 9(a)(5) and 9(b)(5). Section 9(a)(5) defines Tax Benefit Items to include specifically: "[a]ny other attributes of items of any ACQUIRED ASSOCIATION to which . . . [FAB] succeeds under section 381 of the Code [I.R.C.] whose inclusion on the income tax returns of . . . [TAC] decrease the taxable income of [TAC]." Assistance Agreement, § 9(a)(5) at 50. Section 9(b)(5) states that the term Tax Detriment Items specifically includes: "[a]ny other attributes of items of any ACQUIRED ASSOCIATION to which . . . [FAB] succeeds under section 381 of the Code [I.R.C.] which inclusion on the income tax returns of . . . [TAC] increases the taxable income of [TAC]." *Id.*, § 9(b)(5) at 51. The amount of I.R.C. § 381 Tax Benefit Items, net of I.R.C. § 381 Tax Detriment Items, that TAC has failed to take into account in computing its Hypothetical Tax Liability is $1,007,687.

32.   Section 9(f) defines Cable Gain as taxable income or gain attributable to "(i) the sale of certain cable television assets or stock in the corporation owning such assets, and (ii) any recovery pursuant to claims arising on or before November 30, 1988, relating to the purchase of cable television assets . . ." Assistance Agreement, § 9(f) at 56. The Termination Agreement also clarified that Cable Gain included interest on the installment sale of the cable assets. As a result, Cable Gain does not include state tax incurred from the Cable Gain. TAC improperly offset its tax benefits by $1,916,658 in state tax incurred from the Cable Gain.

33.   TAC incorrectly claimed that $1,256,705 in proceeds from the termination of a qualified employment retirement plan of one of the acquired institutions was a Tax Detriment Item under Section 9.

34.   TAC did not include in its calculation of tax benefit sharing $3,324,000 in losses on Goodwill Assets as required by Section 7.2(b)(iii) of the Termination Agreement.

35. TAC did not account for $1,110,415 in depreciation from the sale of a Covered Asset in 1995. Depreciation is a deductible expense for which the FDIC made assistance payments, and thus it is a Tax Benefit Item.

36. TAC failed to report $876,958 in recaptured bad debt reserves. Section 7.2(b)(ii)(A) of the Termination Agreement states that any recapture of bad debt reserves, whether under I.R.C. § 481 or otherwise, is a Tax Benefit Item under Section 9.

37. When TAC wrote off its reserve for FSLIC assistance in 1996, it failed to take into account $734,266 of tax-exempt assistance payments it had previously received from FSLIC. These tax-exempt assistance payments are Tax Benefit Items under Section 9(a)(4) and are required to be included in income under the Hypothetical Tax Liability computation of Section 9(d)(1).

38. A subsidiary of TAC became insolvent and the subsidiary reported income on its excess loss account (where the tax basis falls below zero, and excess loss account is created, and represents negative tax basis, which can create recapture of income). The subsidiary failed to reflect the FSLIC assistance as taxable income as required by Section 9(d)(1), and thus the recapture reported by the subsidiary should have been $1,788,175 higher.

39. In 1988, FAB sold the stock of its subsidiaries that owned certain cable television assets. In computing its Hypothetical Tax Liability on the sale of such stock, FAB failed to make appropriate downward adjustments to the basis of such stock to reflect the utilization of certain losses that were Tax Benefit Items. This failure resulted in an improper overstatement by $1,564,249 of the net operating losses carried forward and subsequently utilized in 1997 and 1998 by TAC to reduce its Hypothetical Tax Liability.

40. The Tax Benefit Items enumerated above in paragraphs 31 to 39, net of certain corrective adjustments in favor of TAC, total $13,062,708. The resulting tax savings to TAC from these Tax Benefit Items were $4,309,685 and TAC owes the FDIC 60 percent of those tax savings, which equals $2,585,811. The FDIC has demanded that TAC make these payments but TAC has refused to pay the FDIC.

G. <u>TAC's Guarini Claim</u>

41. TAC has alleged that the Guarini Amendment had the effect of prohibiting taxpayers from claiming, as a tax deduction, losses reimbursed with FSLIC-assistance payments. Through its Guarini Claim, TAC seeks to characterize the Guarini Amendment as creating a Tax Detriment Item under Section 9(b)(4), which would reduce the amount of tax benefits to be shared with the FDIC. TAC alleges that, as a result of Guarini Amendment, TAC overpaid its tax sharing obligations to the FDIC in the amount of approximately $41 million.

42. TAC is not entitled to any recovery against the FDIC under its Guarini Claim for several reasons, including, but not limited to: (i) the Guarini Claim is time-barred under the applicable statute of limitations and under the doctrine of laches; (ii) any such claim must be made, if at all, against the United States in the United States Court of Federal Claims; (iii) TAC can prove no damages resulting from the Guarini Amendment; and (iv) the Guarini Amendment does not create a Tax Detriment Item under Section 9(b)(4).

First Cause of Action

(Breach of Contract: Tax Benefit Sharing)

43. The FDIC repeats and realleges the allegations above as if fully set forth herein.

44. TAC breached Section 9 by failing and refusing to pay to the FDIC the portion of tax savings resulting from the Sale to which the FDIC is entitled under Section 9.

45.  TAC further breached Section 9 by failing and refusing to pay to the FDIC the portion of the tax savings described in paragraphs 31 to 39 to which the FDIC is entitled under Section 9.

46.  As a result of TAC's breaches of Section 9, the FDIC has been damaged in the minimum amount of $157.3 million.

Second Cause of Action

(Declaratory Judgment: Tax Benefit Sharing)

47.  The FDIC repeats and realleges the allegations above as if fully set forth herein.

48.  There now exists an actual, justiciable controversy within the jurisdiction of this Court and, pursuant to 28 U.S.C. § 2201(a), the Court may declare the rights of the FDIC and TAC under Section 9.

49.  TAC's interpretation of its obligation to share future tax benefits under Section 9 is erroneous. TAC's erroneous interpretation, and its acts and omissions based on that erroneous interpretation, have caused and will continue to cause substantial monetary damage to the FDIC.

50.  The FDIC is entitled to a judgment declaring its rights under Section 9 to obtain savings from past and future tax benefits arising out of Section 9.

Third Cause of Action

(Declaratory Judgment: Guarini Claim)

51.  The FDIC repeats and realleges the allegations above as if fully set forth herein.

52.  There now exists an actual, justiciable controversy within the jurisdiction of this Court and, pursuant to 28 U.S.C. § 2201(a), the Court may declare the rights of the FDIC and TAC.

53.  The FDIC is entitled to a judgment declaring that TAC is not entitled to any recovery under its Guarini Claim.

## Fourth Cause of Action

## (Declaratory Judgment: Arbitration Provision)

54.     The FDIC repeats and realleges the allegations above as if fully set forth herein.

55.     There now exists an actual, justiciable controversy within the jurisdiction of this Court and, pursuant to 28 U.S.C. § 2201(a), the Court may declare the rights of the FDIC and TAC under Section 9 of the Assistance Agreement and Section 6.1 of the Termination Agreement.

56.     TAC's interpretation of the dispute resolution provision in the Termination Agreement is erroneous.

57.     The FDIC is entitled to a judgment declaring that neither the tax benefit sharing claims alleged by the FDIC herein, nor the Guarini Claim asserted by TAC, are subject to arbitration under the Termination Agreement.

<u>Prayer for Relief</u>

WHEREFORE, the FDIC requests that the Court enter a judgment as follows:

(a) On Count I, a judgment for compensatory damages;

(b) On Count II, a judgment declaring the FDIC's rights under Section 9 to obtain and maintain its share of TAC's savings from past and future tax benefits;

(c) On Count III, a judgment declaring that TAC is not entitled to any recovery under its Guarini Claim;

(d) On Count IV, a judgment declaring that neither the tax benefit sharing claims alleged by the FDIC herein nor the Guarini Claim asserted by TAC is subject to arbitration under the Termination Agreement; and

(e) Costs of this action; reasonable attorney's fees; and or pre- and post judgment interest as permitted by law, and for such other and further relief as the Court deems just and appropriate.

Dated: December 19, 2007                                  Respectfully submitted,

Claire L. McGuire (D.C. Bar No. 247924)     Kirk K. Van Tine (D.C. Bar No. 257139)
Larry L. Goodman (D.C. Bar No. 421980)      David A. Super (D.C. Bar No. 429359)
Leslie A. Conover (D.C. Bar No. 366826)     Samuel J. Waldon (D.C. Bar No. 441885)
Bruce C. Taylor                             Sheila J. Kadagathur (D.C. Bar No. 500647)
John A. Davidovich                          BAKER BOTTS L.L.P.
Shane C. Kiernan                            The Warner
FEDERAL DEPOSIT                             1299 Pennsylvania Avenue, NW
INSURANCE CORPORATION                       Washington, DC 20004
3501 Fairfax Drive                          Tel.: (202) 639-7700
Arlington, VA 22226                         Fax: (202) 639-7890
Tel: (703) 562-2390
Fax: (703) 562-2481

Attorneys for Plaintiff
Federal Deposit Insurance Corporation

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 19, 2007 the foregoing document was in compliance with Local Rules and served on the following counsel of record by Federal Express and electronic mail:

Kent A. Yalowitz
Arnold & Porter LLP
399 Park Avenue
New York, NY  10022
(212) 715-1000
kent.yalowitz@aporter.com

J. Benjamin King
Diamond McCarty LLP
Renaissance Tower
1201 Elm Street, 34th Floor
Dallas, TX  75270

_____
Sheila J. Kadagathur (DC Bar. No. 500647)